Tommy O'BRIEN, Charles S. Brand, Daniel A. Cash, Louis Foster, Glover Gilliam, R.G. Stewart, Triple P. Farms, Roger Walton, Winston Walton, Robert C. Winston, and W and W Farms, Plaintiffs,

v.

APPOMATTOX COUNTY, VIRGINIA, Board of Supervisors of Appomattox County, Virginia, and, Darrell A. Carroll, Jr., Defendants.

No. 02–CV–43.

United States District Court,
W.D. Virginia,
Lynchburg Division.

Nov. 24, 2003.

James B. Slaughter, Anthony L. Michaels, Beveridge & Diamond, Washington, DC, for Plaintiffs.

John Adrian Gibney, Jr., Robert A. Dybing, Thompson & McMullan PC, Richmond, VA, James Edward Cornwell, Jr., Lloyd Lee Byrd, Margaret Ann Neil Cosby, Daniel M. Siegel, Sands Anderson Marks & Miller, Richmond, VA, for Defendants.

*MEMORANDUM OPINION*

MOON, District Judge.

## I. BACKGROUND

The Court has before it Defendants' Motion to Certify Question of State Law and Plaintiffs' Motion for Summary Judgment on counts Four, Five, and Six. For the reasons stated below, Defendants' motion is DENIED and Plaintiffs' motion is GRANTED in part and DENIED in part.

The eleven named Plaintiffs in this action are farm operators in Appomattox County, Virginia. Defendants are Appomattox County, the Board of Supervisors for Appomattox County (the "Board"), and Darrell A. Carroll, Jr., County Administrator. Plaintiffs challenge two County ordinances that relate to the use of "biosolids" (also called "sewage sludge" or "sludge") as a commercial agricultural fertilizer.

Biosolids are the nutrient-rich organic materials resulting from the treatment of domestic sewage in a wastewater treatment facility. After being treated to remove most of the pathogens and carcinogens, biosolids can be applied to a farmer's field as a substitute for commercially available fertilizer. Because biosolids are trucked to farms and land-applied at no cost to the property owner, they provide farmers with an effective, nutrient-rich fertilizer for free.

Application of sewage sludge represents a cheap and technologically viable option for farmers seeking to increase land productivity, however the use of treated waste on agricultural land also has risks. Neighboring property owners often complain about odors. Additionally, pollutants (trace elements or persistent organic chemicals) and pathogens (viruses, bacteria, or parasites) in sewage sludge could potentially contaminate soils, crops, livestock, and even humans. *See* William Goldfarb, Uta Krogmann, & Christopher Hopkins, *Unsafe Sewage Sludge or Beneficial Biosolids?* 26 B.C. Envtl. Aff. L.Rev. 687, 696 (1999). In spite of these concerns, the land application of sewage sludge has been has been practiced for several decades in Virginia, the United States, and Europe. The practice is regulated by the federal government through the EPA, and by the State through the Virginia Department of Health ("VDH").

VDH, in conjunction with the State Water Control Board, administers a permitting process in Virginia that controls the application of biosolids in the state. Between July and September of 2001 Synagro and Nutri–Blend, Inc., two residuals management companies that contract with and are paid by biosolids generators, applied to VDH for permits to land apply biosolids on Plaintiffs' farms. These permit applications were approved and permits were issued on March 29, 2002. Following the issuance of the permits each of the Plaintiffs entered into a contract with either Synagro or Nutri–Blend, Inc. to receive and properly manage biosolids on their farms.

On February 4, 2002, the Board adopted an ordinance (the "Zoning Ordinance") creating the "Agricultural A–1 Intensive Farming Overlay District." Land application of biosolids would be tightly regulated within the new zoning district and the use of biosolids would be prohibited elsewhere. Currently, no areas in the County have been designated for the use of biosolids. To be re-zoned as an Intensive Farming Overlay District, a land owner would have to apply to the County directly, much as if he or she were seeking a special use permit.

On March 18, 2002, the Board adopted a second ordinance (the "Police Powers Ordinance"). The stated purpose and intent of this regulation was to "establish a pro-

cedure whereby the land application of Class B biosolids may be monitored to ensure compliance with all applicable state and local regulations." Section 95–1 of the ordinance noted that "it is the intent of the Board of Supervisors to immediately impose a ban on land application of biosolids, if the General Assembly or the Virginia Supreme Court modifies current law to grant localities the authority to enact such a ban."

Plaintiffs' state permits note that "Conformance to all local zoning and planning requirements is to be addressed separately by [the permit holders] with the County." On June 28, 2002, claiming that the Appomattox Ordinances effectively prohibit the application of biosolids despite the existence of the permits, Plaintiffs filed this lawsuit.

## II. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs move for summary judgment on the fourth, fifth and sixth causes of action of their First Amended Complaint, arguing that the Appomattox Ordinances are *ultra vires* and are preempted by state and federal law.

### A. Clean Water Act preemption

Plaintiffs argue that the biosolids ordinances are preempted by the Clean Water Act. According to Fourth Circuit law, the question of "whether a federal statute preempts a state statute ... is a constitutional question." *Bell Atlantic Md., Inc. v. Prince George's County,* 212 F.3d 863, 865 (4th Cir.2000). "When a court is faced with a constitutional question of federal preemption and a question of state law, the court should 'decide only' the state law question if it provides an independent 'ground upon which the case may be disposed of.'" *MediaOne Group, Inc. v. County of Henrico, Virginia,* 257 F.3d 356,

361 (4th Cir.2001) (citations omitted). Because the preemption issue can be disposed of after a determination of state law, the Court declines to decide the issue of Clean Water Act preemption.

### B. Virginia state law preemption

Plaintiffs next argue that they are entitled to summary judgment on their fifth cause of action because the Appomattox County ordinances are inconsistent with Virginia state law. It is a fundamental principal of Virginia state law that "local ordinances must conform to and not be in conflict with the public policy of the State as embodied in its statutes." *Blanton v. Amelia County,* 261 Va. 55, 540 S.E.2d 869, 873 (2001) (quoting *King v. County of Arlington,* 195 Va. 1084, 81 S.E.2d 587, 591 (1954)). *See also* Va.Code Ann. § 1–13.17.

### i. The Appomattox Ordinances are inconsistent with Virginia Law

Virginia Code section 32.1–164.5 regulates the land application, marketing and distribution of sewage sludge. Any application for a biosolids use permit must also comply with "local government zoning and applicable ordinances." 12 VAC 5–585–620(A)(5). The extent of local government involvement in biosolids regulation is discussed in *Blanton,* where the Virginia Supreme Court held that "[t]he General Assembly, by its enactment of Code § 32.1–164.5, has expressly authorized the land application of biosolids conditioned upon the issuance of a permit." *Blanton,* 540 S.E.2d at 873. Based in part on this holding, the *Blanton* Court struck down an Amelia County ordinance that prohibited the land application of biosolids because such a prohibition was contrary to the express authorization of the General Assembly. *Id.* at 875. According to the standard set out in *Blanton,* in order to prevail on their state law preemption claim Plaintiffs must show that the Appomattox

ordinances preclude the use of biosolids that is authorized by a valid VDH permit. *See Blanton,* 540 S.E.2d at 874 (holding ordinances invalid because they "forbid certain plaintiffs from using biosolids on their farmland even though those plaintiffs have obtained licenses" under the state program).

The General Assembly reacted to *Blanton* by passing legislation that clarifies the role of localities in Virginia's biosolids regulatory scheme. According to this recent legislation "[a]ny county, city or town may adopt an ordinance that provides for the testing and monitoring of the land application of sewage sludge within its political boundaries to ensure compliance with applicable laws and regulations." Virginia Code § 62.1–44.19:3. Given the current state of Virginia law, a locality is prohibited from banning the application of biosolids authorized by a valid VDH permit. However, localities have authority to require testing and monitoring during the biosolids application process.

Defendants argue that both the Police Powers Ordinance and the Zoning Ordinance are permissible under Virginia law, contending that a locality has the power to regulate the application of biosolids under its zoning and police power, and the "testing and monitoring" language used by the General Assembly in section 62.1–44.19:3 and section 32.1–164.5 was intended to grant localities additional authority to adopt ordinances. The Court disagrees. In an official opinion, the Attorney General has opined that the "testing and monitoring" provision "expressly limits the authority of localities to regulate biosolids activities" on the theory that "when the General Assembly expressly bestows certain powers in a statute, it intends to exclude those powers which have been omitted." Op. Va. Att'y Gen., 01–085 (March 29, 2002). Additionally, on March 24, 2003, the Gov-

ernor of Virginia signed into law legislation that clarifies that local concerns are to be addressed by the Virginia Department of Health. 2003 Va. Acts ch. 681 (Senate Bill 1088). Based on this legislation it follows that the regulatory authority of localities is limited to the "testing and monitoring" regulations discussed above. Beyond such regulation, localities are limited to submitting "requests or recommendations concerning such site specific conditions" to the Department of Health. Va. Code Ann. § 32.1–164.6(D).

When amending a statute, the General Assembly "is presumed to have knowledge of the Attorney General's interpretation of that statute in its existing form." *Virginia Soc. for Human Life, Inc. v. Caldwell,* 256 Va. 151, 500 S.E.2d 814, 817 (1998). Accordingly, the Court will assume that the legislature had knowledge of the Attorney General's opinion that localities have only narrow authority to regulate the application of biosolids. *See id.* As stated in this Court's August 2, 2002 Memorandum Opinion on Plaintiffs' Motion for a Preliminary Injunction, "it appears that counties have no authority to regulate biosolids beyond their powers to conduct testing and monitoring."

The ordinance at issue in *Blanton* prohibited the application of biosolids to lands in Amelia County, and Defendants claim that *Blanton* is inapplicable because neither Appomattox ordinance explicitly prohibits the application of biosolids. It appears to the Court, however, that the Appomattox ordinances effectively prohibit the application of biosolids that has been authorized by a valid VDH permit.

### a) The Ordinances are inconsistent with Plaintiffs' VDH Permits

Before biosolids can be applied to any land in Virginia the land owner must apply for, and be granted, a Virginia Pollutant

Discharge Elimination System Permit. Va.Code § 62.1–44.19:3. A permit from the State Health Commissioner must specify the location or locations, and the terms and conditions of the land application of biosolids. Va.Code § 32.1–164.5. The local governing body is notified of all biosolids land application permit requests, and requests are not deemed complete until after a public meeting is held to discuss "technical issues" relating to the proposal. Va. Code § 32.1–164.2. As far as the State of Virginia is concerned, once an applicant has successfully negotiated his way through the Department of Health's biosolids permitting process the applicant may land apply biosolids in a manner consistent with the Department of Health regulations and local regulations.

To become eligible to apply biosolids under the Zoning Ordinance a land-owner must apply for an Intensive Farming Overlay District Permit in addition to obtaining a permit from the Virginia Department of Health. Application of biosolids on slopes in excess of 7% is prohibited under the Zoning Ordinance. Additionally, the Police Powers Ordinance requires that biosolids be applied only through direct soil injection. (Police Powers Ordinance § 95–4(D).) The Police Powers Ordinance also requires that biosolids contractors file "a Contractor Pledge with the County no less than twenty-eight (28) days prior to submitting an application for a Biosolids Use Permit to VDH." (Police Powers Ordinance § 95–5.)

Plaintiffs' VDH permits specifically allow "land application of biosolids on the properties and fields listed," thus the limitation to direct-soil injection is more restrictive than biosolids applications allowed by the state permits. (Biosolid Use Operation Permits, Attached to Plaintiffs' Complaint as Exhibits A and B.) Some of the permitted land consisted of slopes in excess of 7%. (*See* Field Data Sheets, attached to Plaintiffs' Reply as Exhibit A.) Additionally, by requiring contractors to file a Contractor Pledge twenty-eight days before submitting an application for a Biosolids Use Permit to VDH, the County effectively guarantees that Plaintiffs' cannot qualify to apply biosolids to their farms based on their current Biosolids Use Permit unless they successfully argue that the 28 day requirement should not apply. These requirements directly contradict the state's decision to grant Plaintiffs licenses to apply biosolids to their farms, and are contrary to the Virginia Supreme Court's holding in *Blanton*, 540 S.E.2d at 874. It is clear that the Appomattox ordinances forbid Plaintiffs from using biosolids on their farmland even though Plaintiffs have obtained licenses to do so, and for that reason both the Zoning Ordinance and the Police Powers Ordinance are void and unenforceable.

### b) The Ordinances have an impermissible enforcement mechanism

The Virginia Code sets out a comprehensive state civil enforcement program to support state biosolids regulations. Section 15.2–2286 of the Virginia Code provides that a Zoning Ordinance violation "shall be a misdemeanor punishable by a fine of not less than $10 nor more than $1,000." Va.Code § 15.2–2286(A)(5). It also provides that failure to abate the violation within the time ordered by a court, and each "thirty-day period" thereafter, "shall constitute a separate misdemeanor offense." *Id.* In stark contrast to this civil enforcement scheme, if any of the requirements of the Police Powers Ordinance are violated the offending person is guilty of a Class 1 misdemeanor and may be subject to a jail term of up to one year and a fine of up to $2,500, or both. (Police Powers Ordinance § 95–12.) According to section 95–12 of the Police Powers Ordinance,

"[e]ach day a violation exists shall constitute a separate offense or violation," so the potential criminal sanctions escalate at a rapid rate.

■ Virginia Code section 15.2–1429, which Defendants use to support the criminal penalty section of the Police Powers Ordinance, does allow penalties for zoning violation "as if such violations were misdemeanors," however, "such penalties shall not exceed those penalties prescribed by general law for like offenses." Va.Code § 15.2–1429. Under the terms of the Police Powers Ordinance, Appomattox County would criminalize conduct authorized by valid state permits, and would set penalties that are much stricter than the penalties described for similar offenses in the Virginia Code. The penalty provision of the Police Powers Ordinance is contrary to the Virginia civil enforcement scheme, and for that reason is void and unenforceable.

### ii. The Appomattox Ordinances effectively prohibit the application of biosolids

The Appomattox Ordinances appear to be an attempt to effectively outlaw biosolids in the County without doing so explicitly. Land application is the most common method of biosolids management in the United States. William Goldfarb, Uta Krogmann, and Christopher Hopkins, *Unsafe Sewage Sludge or Beneficial Biosolids?*, 26 B.C. Envtl. Aff. L.Rev. 687, 695 (1999). Because biosolids are typically delivered and applied free of charge, and because the application of biosolids reduces a farmers need to purchase fertilizer and lime, allowing the application of biosolids can save a farming operation both time and money.

In addition to the slope requirement discussed above, the Zoning Ordinance also include a number of restrictive setback requirements, including setbacks of 1,000 feet from public roads, 750 feet from property lines, and between 1,500 and 2,500 feet from houses, depending on the direction of the prevailing winds. (Zoning Ordinance Table 4, Summary of Setback Requirements). It is unclear whether all of the listed setback requirements apply to the application of biosolids, but the ordinance would allow for that interpretation. When developing the zoning ordnance the Appomattox County Board of Supervisors was presented with arguments that they would need to make the Zoning Ordinance "as tough as possible now." (November 5, 2001 Minutes of Appomattox County Board of Supervisors meeting, attached as Plaintiffs' Ex. C.) The Board apparently agreed with this sentiment, and later stated its intent to "immediately impose a ban on the land application of biosolids" if Virginia law were modified to allow such a ban. (Police Powers Ordinance § 95–1, attached as Plaintiffs' Ex. J.) The Zoning Ordinance is not likely to be interpreted in a manner that favors the application of biosolids.

If a land-owner successfully negotiates through the Virginia state regulations and the even more stringent Appomattox Zoning Ordinance, he or she also must contend with the Police Powers Ordinance. This ordinance requires that biosolids be applied only through direct soil injection. (Police Powers Ordinance § 95–4(D).) According to the Declaration of Professor Daniels "direct soil injection ... is not technically possible for semi-solid biosolids, which constitute the large majority of biosolids used in Virginia." The Police Powers Ordinance also and specifically orders setbacks of two-hundred feet from streams, lakes and wells, four hundred feet from homes, and one-thousand feet from schools, churches, nursing homes, and the boundaries of incorporated towns. (*Id.*) Before allowing the application of biosolids on his property, the farm operator is re-

quired to participate in a soil and crop management training program. (Police Powers Ordinance § 95–9.) Further, application of biosolids to lands in Appomattox county is only allowed once every three years. (Police Powers Ordinance § 95–3, definition of "Infrequent land application".)

The Police Powers Ordinance requires Contractors to pledge to indemnify the County for costs incurred in abating pollution and for public nuisances arising from the land application and transportation of biosolids, and are charged a $50 fee to file their pledge. (Police Powers Ordinance § 95–5; § 95–6.) Contractors applying biosolids are required to maintain one million dollars of liability insurance covering all losses and claims arising from the land application and transportation of biosolids. (Police Powers Ordinance § 95–5(B)(7).) The property owner is also liable for losses, damages, injuries, or costs arising from or related to the land application or transportation of biosolids. (Police Powers Ordinance § 95–8.)

Any person transporting biosolids in Appomattox County must obtain a Hauling Permit from the County Administrator's Office. A separate permit must be obtained for each load of biosolids, and a $100 fee is charged per permit. (Police Powers Ordinance § 95–13.)

Some of the requirements under the Appomattox Ordinances, such as the 7% slope requirement and the numerous setback requirements, make it difficult for a property owner to determine what lands are eligible for the application of biosolids. Other requirements, such as the direct soil injec-

tion requirement and the limitation of biosolids application to once ever three years, makes it impractical for a property owner to depend on biosolids as a source of nutrients for his crops. The extensive permitting requirements in conjunction with the haulers' fee, contractors' fee and liability insurance requirements vastly increase the cost of biosolids application. At least one plaintiff, Tommy O'Brien, has stated in an affidavit that land application of biosolids under the Ordinances would be economically impossible. In addition to the economic threat, there is also a criminal threat to property owners under the Police Powers Ordinance, so if a farmer does apply biosolids in a manner that is contrary to the Appomattox Ordinances, he faces rapidly escalating fines and jail time.

Application of biosolids is a low-cost way for farmers to fertilize their crops. The Appomattox ordinances appear to undermine the economics behind the biosolids application program by making it prohibitively expensive to land apply biosolids. The combination of economic and criminal threats is enough to scare away any landowner who might otherwise consider using biosolids to fertilize his property. It appears that the Appomattox ordinances, in effect, are the equivalent of a prohibition on the land application of biosolids. Viewed collectively, however, the Appomattox Ordinances impose a web of onerous regulation and taxes with the effect of prohibiting all land application of biosolids in Appomattox County.[1]

Though it appears that Appomattox County has attempted to prohibit the ap-

---

**1.** An example aptly illustrates this point. If the 750 foot property line offset requirement mentioned in the Zoning Ordinance applies, a 100 square acre plot of land would have less than eight acres eligible for the application of biosolids. If the property were bordered by a public road, less than five acres would be eligible for biosolids application. Thus, if a farmer who owned a 100 square acre plot of land successfully negotiated all of the permitting requirements, he could gain the benefit of free fertilizer on a maximum of eight acres of land. That maximum acreage assumes that the eligible acreage does not violate the 7% grade requirement and no houses, churches,

plication of biosolids, the record is not sufficiently developed for this to form the basis of the Court's ruling. The Court has reviewed a number of topographic maps and notes that Appomattox County consists of rolling hillsides. It is not clear what percentage of the County has slopes of greater than 7%, and it is not clear, given the numerous offset requirements, how much land in the County is eligible for the application of biosolids. It is also unclear how much money a farmer could save through the application of biosolids, or how much money it costs a farmer to comply with the Appomattox Ordinances. Though the record provides some evidence of the actual effect of the Biosolids Ordinances on both a landowners' ability and financial incentive to apply biosolids to his property, the record is insufficient to for these concerns to form the basis of the Court's decision.

## C. Plaintiffs' sixth cause of action is moot

Plaintiffs, in their sixth cause of action, seek a declaratory judgment that the Appomattox Ordinances are *ultra vires* and void. The Court has already found that both the Zoning Ordinance and the Police Powers Ordinance are void and unenforceable. Accordingly, Plaintiffs' Motion for Summary Judgment on their sixth cause of action is denied as moot.

## III. DEFENDANTS' MOTION TO CERTIFY QUESTION OF STATE LAW

Defendants' have moved to certify the following question to the Supreme Court of Virginia:

Whether Va.Code Ann. § 62.1–44.19:3(C) preempts the field of regulation of biosolids such that counties have no authority to adopt police ordinances or Zoning Ordinances regulating the land application of biosolids?

Certification of a question to the Virginia Supreme Court is a matter subject to this Court's discretion. *See Virginia Supreme Court Rule* 5:42(a). The Rule authorizes the Supreme Court to answer such questions on the conditions that "a question of Virginia law is determinative in any proceeding pending before the certifying court and it appears there is no controlling precedent on point in the decisions of the Supreme Court." *Id.*

As discussed above, *Blanton* is binding and is on point. Additionally, a resolution of the question that Defendants propose to certify would not help to resolve all of the issues faced in this case. Certification would cause undue delay, and the law in this area appears clear. Accordingly, Defendants' Motion to Certify Question of State Law is denied.

## IV. CONCLUSION

For the reasons discussed above, Plaintiffs' Motion for Summary Judgment is GRANTED in part and DENIED in part. Plaintiffs' Motion for Summary Judgment on their fifth cause of action is GRANTED. The Court finds that both the Zoning Ordinance and the Police Powers Ordinance are void and unenforceable. Defendants' Motion to Certify is DENIED. An appropriate Order shall issue.

schools, nursing homes, or bodies of water are close to the property.

If only the less restrictive 400 foot offset requirement mentioned in the Police Powers Ordinance applied, a 100 square acre plot of land would have about 38 acres eligible for

the application of biosolids. It is unclear which offsets apply to the application of biosolids, and interpreting this incorrectly could expose the landowner to criminal liability under the police powers ordinance.

## ORDER

The Court has before it Plaintiffs' Motion for Summary Judgment on counts Four, Five, and Six and Defendants' Motion to Certify Question of State Law. For the reasons stated in the attached Memorandum Opinion, Defendants' motion is DENIED and Plaintiffs' motion is GRANTED in part and DENIED in part.

The Clerk of the Court is directed to send a certified copy of this Order and the accompanying Memorandum Opinion to all counsel of record.